UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CASE NO. 1:24-CR-066 |
| | : | |
| vs. | : | Hon. Douglas R. Cole |
| | : | |
| | : | |
| PHILIP COLT MOSS, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S MOTION FOR REVOCATION OF RELEASE ORDER**

The United States files this motion requesting the revocation of the conditions of release set for defendant Philip Colt Moss by Magistrate Judge William P. Kelly on August 13, 2024, in the Southern District of Iowa. Docket No. 15, 4:24-mj-00374 (S.D. Iowa). Because Moss is both a danger to the community and a significant flight risk, he should be detained pending trial.

I. **Introduction**

As outlined in the indictment, Philip Colt Moss likes to watch videos of monkeys being subjected to extreme bodily torture and sexual abuse.[1] To satisfy this desire, Moss

---

[1] It is difficult to convey the extreme violence and sadism present in the videos at issue. As detailed in the indictment, they depict digits and limbs being amputated, bones being broken, genitals being cut off or burned, and sodomy with foreign objects. In addition, most of the videos are quite lengthy, often lasting 30 minutes or more, such that each video depicts numerous acts of torture, only some of which are summarized in the indictment. The monkeys depicted in the videos were generally juveniles or babies and they were sometimes dressed in clothes or diapers prior to being tortured.

1

purchased numerous such videos, administered online groups dedicated to these videos, and spent a considerable amount of time participating in chats focused on the content of these videos.

Moss was charged by way of indictment on June 5, 2024, with Conspiracy to Create and Distribute Animal Crush Videos, in violation of 18 U.S.C. § 371 (Count 1) and Distribution of Animal Crush Videos, in violation of 18 U.S.C. §§ 48(a)(3) and 2 (Count 8). Moss was arrested on August 8, 2024, in the Southern District of Iowa. On August 13, 2024, Magistrate Judge William P. Kelly held a detention hearing. *See* Docket No. 25, 4:24-mj-00374 (S.D. Iowa) (Transcript of Detention Hearing). Prior to the hearing, Pretrial Services in the Southern District of Iowa prepared a Pretrial Services Report ("PSR"). *See* Attachment 1 (sealed). Although Pretrial noted various reasons the defendant posed a risk of non-appearance and danger to the community, it ultimately recommended that the defendant be released with certain conditions. Notably, and as discussed further below, the PSR omitted Moss's pending criminal charges in Iowa state court, *see* Attachment 2 (Criminal Complaint), and his extensive foreign travel. *See* Attachment 3 (CBP travel history). Although Magistrate Kelly ultimately adopted Pretrial's recommendations and ordered the defendant to be released with conditions, Magistrate Kelly also issued a stay of his order, allowing for review by this court. Docket No. 21, 4:24-mj-00374 (Text Order).

Because there is not a combination of conditions that can reasonably assure Defendant Moss's appearance at trial or protect the community, the government urges this court to revoke the order of release.

## II. Legal Standard

This motion is before court pursuant to 18 U.S.C. § 3145(a)(1). This Court reviews the magistrate judge's release order de novo. *United States v. Yamini*, 91 F. Supp. 2d 1125, 1130 (S.D. Ohio 2000). "[M]eaningful de novo review means that the district court should engage in the same analysis, with the same options, under § 3142 as the magistrate judge." *Id.*

When evaluating whether a defendant may be released pending trial, courts must examine whether the defendant presents a risk of flight or a danger to the community. *See* 18 U.S.C. § 3142. *See also United States v. Cobix-Espinoza,* 655 F.Supp.3d 584 (E.D. Ky. 2023) (explaining the broad scope of a court's inquiry where a detention hearing is held under § 3142(f)(2)). Under 18 U.S.C. § 3142(e), a defendant shall be detained pending trial if, after a hearing, the judicial officer finds that no condition or set of conditions will reasonably assure the defendant's appearance as required and the safety of any other person and the community.

In determining whether there are conditions that will reasonably assure the appearance of the person as required and the safety of any other person and the community, judicial officers are directed to consider: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including the person's character; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). "Detention premised on nonappearance

3

requires preponderant evidence that no conditions can reasonably assure the defendant's future appearance…Danger-based detention, however, demands clear and convincing evidence that no combination of conditions will reasonably ensure community safety." *Cobix-Espinoza*, 655 F.Supp.3d at 594-95 (*citations omitted*).

### III. <u>Argument</u>

Defendant Moss should be detained because he presents a flight risk and a danger to the community that no condition or combination of conditions will alleviate. 18 U.S.C. § 3142(e).

### a) *Nature and Circumstances of the Offense Charged*

The nature and circumstances of the offense clearly show that the Defendant presents a danger to the community. As described by Magistrate Judge Kelly in the Southern District of Iowa, the charged conduct is "absolutely horrible" and "most people…probably shouldn't hear of because of how despicable and heinous the actions are." Docket No. 25 at 48, 4:24-mj-00374. Moreover, Defendant Moss was deeply involved in the criminal conduct underpinning the charged offenses. He was a member of over a dozen different Telegram groups dedicated to this noxious material. He also started his own Telegram group called "The Dick The Dox and Baby Monyet,"[2] which had approximately 54 members. He engaged in voluminous one-on-one chats with other members of these groups. For instance, his chat messages with Co-Defendant Nicholas

---

2 Note: "monyet" is the Indonesian word for monkey.

4

Dryden cover 130 pages just for the period between April 15, 2023, and April 22, 2023, alone. *See* Attachment 4 (Moss-Dryden Chats) (sealed).

Moreover, these offenses carry substantial sentences, which weighs in favor of detention because it increases the likelihood that the defendant will flee. *See United States v. Bothra,* 2019 WL 8883547 at *2-4 (6th Cir. March 28, 2019) (considering the length of the possible sentence relative to the risk of flight). In addition, although the charged conduct only extends until on or about April 22, 2023, there is evidence that the Defendant engaged in similar conduct far more recently. *See* Attachment 5 (Sample Moss[3] Telegram messages from October 2023-January 2024). This additional, as-yet-uncharged conduct would also provide motivation for the defendant to flee if he were to be released now.

Accordingly, the nature and circumstances of the offense support the position that the defendant is a flight risk and a danger to the community, and, therefore, this factor weighs in favor of detention.

b) **Weight of Evidence Against the Person**

The weight of the evidence against Moss supports the argument that he should be detained. *See United States v. Hazime,* 762 F.2d 34, 37 (6th Cir.1985) (noting that the weight of evidence against the person "deals with the factors to be considered in determining whether there are conditions which will assure the appearance of the accused

---

3 Moss used several different names in these groups, including Colt Moss, c Mo, C-Rave, and bonjoursinge.

5

and safety of the community"). The evidence in the case will include logs of chats by the defendant, which support the allegations using the defendant's own words, along with payments made by Defendant Moss, and other electronic evidence. There is substantial, hard evidence that Moss presents a danger to the community, particularly since the criminal conduct itself was predicated on acts of extreme brutality. The evidence which demonstrates the defendant's guilt of the charged offenses, which includes the defendant's own words and conduct, likewise demonstrates the danger to the community if he were released. There is a danger not only that the defendant will continue to engage in the underlying conduct personally, but also that we will continue to share the videos in question, both of which would harm the community.

Similarly, as detailed below and in the PSR, there is strong evidence that Moss has the resources to flee, has experience travelling internationally, and has contemplated leaving the country since he was charged in the underlying indictment.

c) *History and Characteristics of the Person*

The Defendant's history and characteristics also weigh in favor of detention. In assessing this factor, the statute identifies eleven nonexclusive areas for the court's consideration. Those areas are (a) the defendant's character; (b) his physical and mental state; (c) his family ties; (d) his employment; (e) his financial resources; (f) the length of residence in the community/community ties; (g) past conduct; (h) history relating to drug or alcohol abuse; (i) criminal history; (j) record concerning appearance at court proceedings; and (k) whether, at the time of the current offense or arrest, the person was

on probation, parole, or other release pending trial, sentencing appeal, or completion of a sentence. 18 U.S.C. § 3142(g)(3). Here, Moss has a history of drug use, has frequently travelled internationally, has discussed travelling internationally without a passport, has the resources to flee, has engaged in potentially misleading conduct before the Magistrate Judge in the Southern District of Iowa, and was on pre-trial release at the time of his arrest. Each of these strongly militate in favor of the defendant not being released.

The defendant's abuse of opiates and other hard drugs began at least eight years ago. In 2016, Moss was arrested on numerous drug-related charges. According to news reports at the time, Moss, who was working as an attorney, was found to be in possession of hashish, OxyContin, Klonopin, and Xanax. *See* Attachment 6 (Des Moines Register Article). According the PSR, Moss completed "six months of dual diagnosis inpatient treatment through Cliffside: Malibu" and was ultimately given a probationary sentence.

Following his 2016 arrest, the Defendant's use of illicit drugs continued. According to the PSR, "[a]pproximately two years ago, the defendant began abusing OxyContin." On May 14, 2024, "the defendant was admitted into dual diagnosis inpatient treatment through Carrara Luxury Rehab" in California. *See id.* at 2. At the detention hearing, counsel for Moss argued that his recent treatment was not connected to any criminal charges. She stated, "[u]nlike in 2016, this is unrelated to any criminal charge pending at the time. He made the decision for himself, for his wife, for their two dogs,

7

and for his future…He was there for 70 days having extremely intensive treatment according to his wife."[4]

In fact, Moss did have a criminal charge pending at the time, a fact he neglected to share with the Pretrial Services Officer, the Court, or, apparently, his counsel. Over three weeks before Moss entered rehab, he was found passed on in his car outside his house by the Waukee Police Department. *See* Attachment 7 (Police Report from April 20, 2024). He had a pipe in his hand and a piece of tinfoil with a burnt black substance was nearby. The black substance later tested positive for fentanyl. Moss's wife was interviewed and told police that he was scheduled to go to rehab that same day. *Id.* Moss was arrested, charged with possession of drug paraphernalia and released. *See* Attachment 2. However, Moss did not go to rehab that day, nor the next. He did not, in fact, go to rehab until 24 days after his arrest in April.

The timing of Moss's arrest, coupled with his admission into rehab over three weeks later, calls into question the statements made by Moss's wife to police that he was scheduled to go to rehab that day, as well as Moss's argument to the Magistrate Judge that his treatment was "unrelated to any criminal charge pending at the time." The fact that Moss would apparently neglect to tell the Pretrial Services officer about his pending charges, and then sit silently as his attorney, likely unknowingly, made this dubious

---

4 The United States was monitoring Moss's movements via the location of his cell phone for much of this period. In contrast to his wife's claim of "extremely intensive" inpatient treatment, Moss appears to have been moving throughout Los Angeles nearly every day in which he was monitored. *See* Attachment 8 (Maps showing locations of Moss's phone between June 13, 2024, and June 26, 2024).

representation bears strong indications that Moss was engaging in misleading behavior towards the court. This behavior, which was unknown to the Magistrate Judge, militates against the defendant being granted release.

Moss's communications with his co-defendants likewise demonstrates that release is inappropriate. Prior to his arrest, Moss and Nicholas Dryden discussed travelling to meet each other, either in the United States or abroad. In one instance, Moss proposed meeting in Chicago:

> Moss: I was gonna say. If it was too far I could meet u in like chicago and we could kick it and get wild in the city
>
> Moss: I got whatever. You need. I got a hookup for anything you're looking for. Uppers downers. Girls. Lol
>
> Moss: You gotta remember as a defense attorney. I know all the dealers bc I represent them
>
> Moss: From weed to mushrooms. Coke to meth. Molly to acid. Dope to tar. Xanax.
>
> Moss: Like. You gotta check it out

Later, Moss and Dryden discussed meeting overseas in Indonesia without a passport:

> Moss: when u wanna go
>
> Moss: not just flying their but i got us for hotels too. check this out
>
> Moss: ive got over a million marriott points
>
> Moss: A ,MILLION
>
> Moss: lol

Moss: its nice as fuck. we will get suites on the beach of bali

Moss: kick it a few days

Moss: handle some business

Moss: meet some people

Moss: slap a monkey

…

Moss: my boy lives in ubud

Moss: an hour outside bali

Moss: i also have a connection in manilla philliines and ho chi mihn city Vietnam

…

Dryden: We can go visit the vo.[5] and ur dude

Moss: i would love that dude

…

Moss: we dont need a backup plan

Moss: thats going to work

Moss: no passport. just grab a birth certificate

Dryden: Okay. I'll take your word for it

Moss: i swear

Moss: trust me

Moss: we would have the time of our lives

Moss: and make our own sauce[6]

---

5 Note: "vo" is short for "videographer," which refers to the individuals who perform and film the requested acts of monkey torture.
6 Note: "sauce" is a slang term for monkey torture videos

As demonstrated by these conversations, Moss's history and characteristics show that release would be inappropriate. Moss brags about illicit drug availability and use, about his ability to travel internationally with ease (including potentially without a passport), and about his interest in performing acts of torture himself.

A review of Moss's travel history shows that his discussion of international travel was not mere bluster. According to data provided by U.S. Customs and Border Patrol,[7] Moss has travelled internationally regularly in the past five years, including to Taiwan, Mexico, Japan, and Grenada. *See* Attachment 3. The CBP document also indicates that Moss booked a flight from Los Angeles (LAX) to Cancun, Mexico, on July 15, 2024 (although he ultimately did not board the flight). This is significant as the flight was booked after law enforcement attempted to arrest Moss in Iowa on the current charges, and while he was in California undergoing drug treatment.

d) *Defendant's Release Plan*

The adequacy of a defendant's release plan bears on whether there are conditions that can reasonably assure his appearance and the safety of the community. In the PSR, Moss's wife, Andrea Skinner Moss, was proposed as a third-party custodian, and it was represented that Moss would go back to work at Moss Distributing, where Moss has been employed "[f]or approximately four

---

[7] The data in the report was provided for informational purposes by CBP and has not been independently verified by the prosecution team.

11

years…[as] a sales representative." PSR at 2. There are issues with both these components of the defendant's release plan.

First, Moss's wife is not a suitable third-party custodian. According to chats between Moss and co-defendant Dryden, Moss's wife was aware of his involvement with the groups in question:

> Dryden: Ahhaha hell yea bro do u tell her about the whole monkey shit?
>
> Moss: Man I try to cuz she's a cool ass girl and she's a party girl. She doesn't really get the monkey thing which. Makes sense but she likes that it's a little community and it seems to make me happy
>
> …
>
> Moss: I told her you were gonna make it here eventually and she's gonna set u up with one her friends
>
> Moss: She's got super hot friends

To the extent that Moss's wife knew about the underlying conduct and did nothing to stop it, she is an unsuitable third-party custodian. Moss, however, claims that his wife did not know about his activities. *See* Transcript of Detention Hearing.[8] Even if this denial is true, Moss's wife is still an unsuitable third-party custodian. If Moss had not told her about his obsession with monkey torture videos, it begs the question how she did notice this behavior on her own. Moss spent a large amount of time indulging in this fetish. His chats with co-defendant Dryden from a single one-week period stretch on for

---

8 Another question that arose regarding Ms. Skinner Moss at the detention hearing was whether she had improperly attempted to contact her husband using a confidential line meant for attorney client-communications. This situation was summarized in an Incident Report from the Polk County Sheriff's Office. *See* Attachment 9.

over a hundred pages, and at the same time Moss was participating in other one-on-one chats, group chats, and spending time and money acquiring and viewing new monkey videos. If Moss's wife truly did not notice any of this, then it calls into question her ability to monitor Moss's compliance with his conditions if he were released.

Regarding Moss's plan to return to work, Moss told the Pretrial services Officer that he was working as a sales representative for Moss Distributing, his father's company, for the past four years, and that "[i]f released, the defendant wishes to return to said employment." However, according to information provided to the government, Moss began working for Moss Distributing in early 2022, worked irregularly, and was terminated as of August 8, 2024. This not only calls into doubt Moss's release plan, but is potentially another instance of Moss being untruthful with the court. At a minimum, if this Court is contemplating releasing the Defendant, the government requests that it consider ordering a new PSR that verifies Moss's pending criminal charges, his international travel, his community ties, his wife's suitability as a third-party custodian, and his employment.

## IV. Conclusion.

For all these reasons, the United States requests that the Court revoke Defendant Moss's release.

KENNETH L. PARKER
UNITED STATES ATTORNEY

TODD KIM
ASSISTANT ATTORNEY GENERAL
Environment and Natural Resources Div.

*s/ Adam C. Cullman*
ADAM C. CULLMAN (KY#93912)
SR. TRIAL ATTORNEY
SPECIAL ASSISTANT U.S. ATTORNEY

*s/ Timothy D. Oakley*
TIMOTHY D. OAKLEY (0039965)
ASSISTANT U.S. ATTORNEY

United States Attorney's Office
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
(513) 684-3711

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing *Government's Motion for Revocation of Release Order* has been electronically served via the Court's CM/ECF system upon all counsel of record this 23rd day of August, 2024.

*s/ Adam C. Cullman*
ADAM C. CULLMAN (KY#93912)
SR. TRIAL ATTORNEY
SPECIAL ASSISTANT U.S. ATTORNEY
